THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CESAR VALDEZ-SANUDO,<br><br>Defendant. | CASE NO. CR20-0217-JCC<br><br>ORDER |

This matter comes before the Court on Defendant Cesar Valdez-Sanudo's motion for amendment of detention order (Dkt. No. 126). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

**I.      BACKGROUND**

On December 9, 2020, the grand jury returned an indictment charging Mr. Valdez-Sanudo and ten co-defendants with Conspiracy to Distribute Controlled Substances (heroin, methamphetamine, and cocaine) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (Dkt. No. 1 at 1–3.) Mr. Valdez-Sanudo was also charged with Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). (*Id.* at 3–5.) The charges stem from a multi-agency investigation into a drug trafficking organization in Western Washington

that resulted in the seizure of about 93 pounds of methamphetamine, 15 pounds of heroin, 35,000 suspected fentanyl pills, 24 firearms, $525,000, and a bank account valued at $100,000.[1] (Dkt. No. 78 at 2.) The Government alleges that Mr. Valdez-Sanudo was a leader within the drug trafficking organization and a wholesale distributor of methamphetamine, heroin, and suspected fentanyl pills. (Dkt. No. 78 at 5.) The Government alleges that he regularly traveled to California and directed others to travel to California to pick up large drug shipments and pay suppliers and laundered hundreds of thousands of dollars in drug proceeds through real property purchases, casino gambling, and bank accounts. (*Id.*)

The investigation into Mr. Valdez-Sanudo and the drug trafficking organization involved numerous wiretaps. (Dkt. No. 78 at 2.) Among other communications, agents intercepted several calls in November 2020 during which Mr. Valdez-Sanudo and co-defendant Aaron Alarcon-Castaneda discussed a shipment of 50 pounds of methamphetamine that "Gordito" would transport to Washington. (*Id.* at 5–7.) On November 9, 2020, Alarcon-Castaneda told Mr. Valdez-Sanudo that Gordito "would head out the following morning" and that "the red truck was hauling." (*Id.* at 6.) The next day, Alarcon-Castaneda confirmed to Mr. Valdez-Sanudo that Gordito left around noon with 47-and-a-half pounds of methamphetamine. (*Id.*) Based on the intercepted communications, agents expected Gordito to cross the Oregon-Washington border after 4:30pm. (*Id.*) Shortly after that, agents saw a white truck heading north on I-5 towing a trailer. (*Id.* at 6–7.) A black truck was on the trailer. (*Id.*) But when officers ran the license plate of the black truck, they discovered that the truck's registration indicated it was red. (*Id.*) Eventually, law enforcement stopped the white truck for a traffic violation, identified the driver as co-defendant Fausto Paz, and discovered that he was transporting 49 pounds of

---

[1] In a related case stemming from the same investigation, the grand jury returned an indictment charging 20 individuals with Conspiracy to Distribute Controlled Substances and two of those individuals with Conspiracy to Commit Money Laundering. *United States v. Gomez-Marentes, et al.*, Case No. CR20-0092-JCC (W.D. Wash. 2020). That case involves additional seizures of drugs.

1  methamphetamine. (*Id.* at 7.)

2  During an intercepted call on November 16, 2020, Mr. Valdez-Sanudo and Alarcon-Castaneda talked about the traffic stop. (*Id.* at 8.) Alarcon-Castaneda said he talked to his "godmother" who believed that Paz had stolen the drugs and they were at his house. (*Id.*) Mr. Valdez-Sanudo responded that he would go to Paz's house and "beat him with a pistol" until he handed over the drugs. (*Id.*) When Alarcon-Castaneda said he would go "have a long talk" with Paz, Mr. Valdez-Sanudo told him to "put the cables on his crotch," which agents interpreted as a direction to torture Paz until he gave up the drugs. (*Id.*) Later that night, Mr. Valdez-Sanudo told another co-defendant that he was going to "fuck up" Paz and do the same to Alarcon-Castaneda if he got in the way. (*Id.*) As a result of these communications, agents contacted local police in California where Paz resided. (*Id.* at 8.) Officers went to Paz's house, told him they were contacting him about the drugs found in his vehicle the previous week, and gave him an incident number so he would have a document proving that law enforcement had the missing drugs. (*Id.* at 8–9.) A few minutes later, Alarcon-Castaneda called Mr. Valdez-Sanudo and told him he had been at Paz's house when the officers arrived and had fled out the back door. (*Id.* at 9.)

On December 16, 2020, agents arrested Mr. Valdez-Sanudo while he was in the driver's seat of a vehicle at the Snoqualmie Casino. (*Id.* at 9; Dkt. No. 104.) Investigators found a loaded pistol at Mr. Valdez-Sanudo's feet, a loaded SKS rifle with a makeshift suppressor behind the passenger seat, and empty packaging with residue consistent with methamphetamine. (Dkt. No. 78 at 9–10.) Investigators also found about $50,000 to $70,000 cash in Mr. Valdez-Sanudo's hands, pockets, and various places in the vehicle. (*Id.*) That day and the next, investigators searched multiple properties associated with Mr. Valdez-Sanudo, including a ten-acre property in Arlington. (*Id.* at 10.) There, agents found over 65 pounds of methamphetamine; 12 pounds of heroin; 16,000 fentanyl pills; $290,000 in cash; ten firearms; and a drug scale and ledger. (*Id.* at 11–14.) The drug scale and ledger, as well as seven of the firearms—two rifles, three pistols, a shotgun with a pistol grip, and an AR-15 equipped with an attachment for a suppressor—were

found in a fifth wheel trailer where it appeared Mr. Valdez-Sanudo was living. (*Id.* at 12.)

Mr. Valdez-Sanudo is a green card holder and legal permanent resident who was born in Mexico and came to the United States about 20 years ago when he was 16 years old. (Dkt. No. 79 at 2.) He has been married to codefendant Yvette Olguin since 2006 and together they have three children, ages 7, 11, and 13. (*Id.*) Ms. Olguin also has a daughter from a prior relationship. (*Id.*) Mr. Valdez-Sanudo's parents and siblings live in Mexico, and he has a Mexican passport. (*Id.*) He has traveled to Mexico about eight times in the last 20 years and last visited family there two years ago. (*Id.*) He has no criminal history and has been unemployed for two years. (*Id.* at 2–3.)

Following a detention hearing on December 21, 2020, Judge McCandlis ordered Mr. Valdez-Sanudo detained, finding that no conditions of release could reasonably assure his appearance or the safety of the community. (Dkt. No. 83.) Mr. Valdez-Sanudo asks the Court to revoke the detention order and release him on the conditions recommended by U.S. Probation and Pretrial Services in its supplemental report, emphasizing his lack of criminal history, strong ties to the community, and stable residence. (Dkt. No. 126.) He seeks release to his Everett residence where he says he has been living with his wife and children for the past five years. (*Id.*)[2] The Government opposes release, emphasizing the nature and circumstances of the crime, including the violent threats Mr. Valdez-Sanudo made, and Mr. Valdez-Sanudo's strong ties to Mexico. (Dkt. No. 130.)

//
//
//

---

[2] Mr. Valdez-Sanudo's wife, Yvette Olguin, is a co-defendant in the case and was released on bond to their Everett address in December 2020. (Dkt. No. 51.) Her release conditions prohibit contact with co-defendants, but she can live with her mother at a separate residence in Snohomish if Mr. Valdez-Sanudo is released. (Dkt. No. 126 at 2 n.1.) Therefore, the Court does not consider this an obstacle to release.

ORDER
CR20-0217-JCC
PAGE - 4

## II. DISCUSSION

### A. Standard or Review

Under the Bail Reform Act, "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The Court reviews a magistrate judge's detention order *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The court must review the evidence before the magistrate judge and any additional evidence proffered by the parties and reach an independent conclusion about whether the defendant should be detained, without deference to the magistrate judge's decision. *Id.*

### B. Legal Standard for Detention

A defendant may be detained before trial only if "no condition or combination of conditions will reasonably assure the [defendant's] appearance . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Government bears the burden of proving by a preponderance of the evidence that no conditions will reasonably assure the defendant's appearance and by clear and convincing evidence that no conditions will reasonably assure the safety of the community. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

When analyzing whether conditions can reasonably assure the defendant's appearance and the safety of the community, the Court must consider (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the danger to the community the defendant would pose if released. 18 U.S.C. § 3142(g). Of these factors, the weight of the evidence is the least important, and the statute does not permit a pretrial determination of guilt. *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). The Government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the relevant facts. *See United States v. Cardenas*, 784 F.2d 937 (9th Cir. 1986).

If the Court finds probable cause to believe the defendant committed a drug offense with a maximum term of imprisonment of at least ten years, there is a rebuttable presumption the defendant should be detained. *See* 18 U.S.C. § 3142(e)(3)(A). Once the defendant produces some evidence to rebut the presumption, "the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)).

### C. Presumption of Detention

A grand jury indicted Mr. Valdez-Sanudo for Conspiracy to Distribute Controlled Substances, Possession of Methamphetamine with Intent to Distribute, and Conspiracy to Commit Money Laundering. (Dkt. No. 1.) Mr. Valdez-Sanudo does not dispute that, based on the indictment, the presumption of detention applies. (*See* Dkt. No. 126 at 5.) As discussed in more detail below, Mr. Valdez-Sanudo has presented "some evidence" favorable to him relevant to the § 3142(g) factors. He has therefore met his burden of production to rebut the presumption of detention, but the Court still weighs that presumption along with the § 3142(g) factors in determining whether Mr. Valdez-Sanudo should be released.

### D. Flight Risk

The Court finds that the Government has met its burden to prove by a preponderance of the evidence that no set of conditions can reasonably assure Mr. Valdez-Sanudo's appearance.

First, the evidence against Mr. Valdez-Sanudo is strong enough for him to believe there is a reasonable chance of conviction. Among other things, the Government intercepted phone calls where Mr. Valdez-Sanudo discussed large drug shipments; intercepted one such shipment; and discovered over 65 pounds of methamphetamine, 12 pounds of heroin, tens of thousands of fentanyl pills, large amounts of cash, several firearms, and a drug scale and ledger on the property in Arlington. Given the strength of the evidence against him and the potential prison term he faces, Mr. Valdez-Sanudo has a strong incentive to flee. Moreover, Mr. Valdez-Sanudo

has ties to Mexico, where he was born and where his parents and siblings still live. While the Court acknowledges Mr. Valdez-Sanudo's ties to this district, including his wife and children, the Court finds that his local ties are not enough to overcome the strong incentive to flee, especially considering that his wife is also charged in this case and may share a motive to flee. Having considered the presumption of detention and the § 3142(g) factors, the Court concludes that no set of conditions can reasonably assure Mr. Valdez-Sanudo's appearance.

### E.   Danger to the Community

The Court also finds that the Government has met its burden to prove by clear and convincing evidence that no set of conditions can reasonably assure the safety of the community.

The nature and circumstances of the offense demonstrate that Mr. Valdez-Sanudo would pose a danger to the community if released. Mr. Valdez-Sanudo is accused of conspiring to distribute significant quantities of dangerous drugs, reflecting a serious disregard for the personal safety of others. The Government proffered evidence showing that Mr. Valdez-Sanudo was a leader in the drug trafficking organization and directed others to travel to California to pick up drugs. While the Court could impose conditions like GPS monitoring that may reduce the risk of Mr. Valdez-Sanudo transporting drugs and guns himself, those conditions could not prevent him from continuing to manage and direct others participating in dangerous trafficking operations.

More importantly, the Government discovered ten firearms at Mr. Valdez-Sanudo's Arlington property and multiple loaded firearms in his vehicle when he was arrested. The Government also intercepted communications during which Mr. Valdez-Sanudo threatened his co-conspirators and directed others to harm them.[3] While Mr. Valdez-Sanudo has no prior criminal history, the Court finds that, on balance, a consideration of the § 3142(g) factors weighs

---

[3] In addition to the threats against Paz, the Government proffered evidence that Mr. Valdez-Sanudo intended to harm a co-conspirator referred to as "Shamrock" on the night he was arrested. (Dkt. No. 130 at 6.) Several days after Mr. Valdez-Sanudo's arrest, a co-conspirator whose last name is Spurlock called 9-1-1 and reported that he had been attacked by an enforcer and hospitalized with a brain bleed, but he did not identify the person who attacked him. (*Id.*)

ORDER
CR20-0217-JCC
PAGE - 7

1  in favor of detention.

2  **III.   CONCLUSION**

3     For the foregoing reasons, the Court DENIES Mr. Valdez-Sanudo's motion to amend the
4  detention order (Dkt. No. 126).

5     DATED this 12th day of April 2021.

John C. Coughenour
UNITED STATES DISTRICT JUDGE